## Kentucky Utilities Co. v. Hodges' Adm'r (two cases).

Dec. 21, 1945.

T. M. Galphin and Ogden, Galphin, Tarrant & Street and E. L. Morgan for appellant.

Astor Hogg, C. D. Bell and R. L. Pope for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER— Reversing.

Oscar Hodges, a ten-year old boy, came in contact with a live electric wire and his mother, Mrs. Ola Hodges, came to his rescue and grabbed the wire to pull it loose. Both were killed. Their personal representative has recovered judgments against the Kentucky Utilities Company for $5,000 and $3,000, respectively. The only ground upon which a reversal is sought is that the court should have peremptorily instructed the jury to find for the defendant.

There can be no doubt that the negligence of someone was responsible for the deaths. The question is whether the Kentucky Utilities Company is chargeable

with that negligence. The answer depends upon whether it had taken over for its own use the wiring system of a mining company which had ceased to operate and was in the hands of a receiver of bankruptcy at the time the accidents occurred. Neither the mining company nor receiver was sued.

The appellant had delivered electric current to the Ridgeway Darby Coal Company at a meter and substation on the north end of the Coal Company's premises. It was then carried on the Coal Company's system south, passing through transformers; thence one line into a switch in what is called a motor barn or repair shop. Wires ran from that building northwestwardly about 45 feet to the tipple. There was a mine tram track beneath this 45 foot length of wire close to the motor barn, and two cars filled with slate had been left at this point unfastened. The top of the load was variously estimated from 26 to 36 inches from the ground. The overhead electric wires were only from five to seven feet from the ground and the insulation was worn and entirely off in some places, strings of it hanging down. There was a trolley wire a foot below the electric wires but it had no current in it. A highway ran north and south along or through the premises east of the tram track, and between the highway and the electric line running from the meter to the transformers were several residences, in one of which the deceased mother and son lived. Their home was about 120 steps, or 360 feet, from the low sagging and defective live wire and the small tram cars. The highway was 225 feet away. There were some houses on the other side of the highway. Ten or twelve children were in the camp or community. There was no fence surrounding this place and no warning sign at this point of danger. It was about the only level place near the residences, the rest of the mining premises being on the mountain side. It is well established that children had been playing on and with these tram cars after the mine had closed down. They would push the cars up the track a short distance and ride them as they rolled back. A child could stand on the car and touch the overhead wires with his hands. There were also some old automobiles tires and other junk material near by with which the children played. The situation can readily be recognized as an attractive nuisance and an obviously unsafe place and condition. Union Light Heat & Power

Co. v. Lunsford, 189 Ky. 785, 225 S. W. 741; Louisville & N. R. Co. v. Vaughn, 292 Ky. 120, 166 S. W. 2d 43.

Oscar Hodges and other children were playing at this point when he met his death. It was a wet rainy afternoon. His younger brother testified that he had seen him lean an old automobile tire against the motor barn, which in part was covered with metal, and then pass out of his view. In a minute he heard Oscar holler and saw him holding the overhead wire with both hands and his body between the building and one of the tram cars. He gave an alarm and a young lady first arrived. She testified that the boy was lying on his back with his eyes set and the hand in which he held the naked part of the wire was smoking. He was on the track with his feet almost touching the tram car. His mother ran up and grabbed the wire and instantly fell. The witness called to her to turn it loose, and she answered, "I can't." Her hand also began to burn and she died.

It does not appear to be of materiality whether the contention of the plaintiff is correct, that these wires were deadly because connected with the system by a switch in the motor barn, or whether the condition was, as the defendant undertook to establish, due to some phenomenon by which the sheet metal wall of the building had become charged and a current formed by the touching of it and one of the wires or the wet ground. The Company introduced proof that the switch in the building had been thrown in July previous and that there was no current in the overhanging outside wires or within 12 feet of the wall of the building. In either event, there was a condition and defect for which somebody was legally liable. Either condition was caused by negligence. The material point in the case is the relationship of the Kentucky Utilities Company, whose electricity caused the deaths.

The evidence for the plaintiff is that Lee Coldiron, who lived in one of the nearby houses described, collected charges for the electricity from the Hodges and 48 other families living in the mining camp and paid the money over monthly to the Kentucky Utilities Company at its office in Harlan. The bills were on forms of that Company and were sent to Coldiron by it. There were no separate meters for the several houses as the charges were fixed at 50 cents for each light and other definite

sums for electric utensils. The total collections averaged about $200 a month. Coldiron had collected these service charges since the mine closed down several months before the accident. The charges had formerly been deducted by the mining company from the pay roll. Coldiron was employed by the receiver of the Coal Company as overseer of the mine premises, and also collected rents from the occupants of the residences in the camp, which he paid over to the receiver. He made no inspection of the wires or distribution system, his whole duty being the collection of the electric charges.

It should be said that the adverse part of this evidence came from Coldiron, who, apparently from necessity, was introduced by the plaintiff as a witness. Whatever inference may be gathered from the evidence of the relationship of agency of Coldiron to the Kentucky Utilities Company, or inference that it had taken over the equipment or wiring system of the mine Company and used and applied it for its own purpose and benefit, is dispelled by positive and uncontradicted evidence introduced by the defendant. It may be briefly stated:

Fred W. Smith was the receiver of this property. With the approval of the bankruptcy court, he had employed Coldiron for the purposes described and paid him $5 a day. Coldiron looked to no one else in the discharge of his duties. In the beginning of the receivership, Smith had requested the appellant, in writing, to continue its electric service at the Coal Company's plant, and as receiver agreed to be responsible for future bills. The Company read its own meter monthly and billed the receiver for the amount at the same rates theretofore charged the Coal Company. As the receiver's agent, Coldiron collected the electric charges from the residents in the camp, and because he had no safe place to keep the money, at Smith's direction he had turned over the monthly collections to the office of the Kentucky Utilities Company, in Harlan, which was nearby. Sometimes the monthly bill was larger than the aggregate, since a mine fan and pump were being served. The difference was paid directly by the receiver. The mine company's contract with a labor union called for a charge of 45 cents an outlet in the camp houses and the amounts were deducted from the pay roll. The receiver found it necessary to raise this rate to 50 cents. It appears, therefore,

that the current was merely resold by the receiver to the individual consumer. The operating officials of the Kentucky Utilities Company sustained this testimony and proved that that company had never had anything to do with the distribution system beyond its meter near the north end of the premises. It had merely sold the power to the receiver, measured the quantity in that meter, and billed him for the amount. The mine in which there had been a fire was 4,500 feet away from the point of the accident, and, therefore, the fire had had no effect upon the wiring system which served the tipple and the camp houses. There was no evidence, direct or circumstantial, that anyone connected with the appellant knew or was in position to know of the dangerous condition or of the habit of children to play there.

No one questions the established law that the owner of electric wires carrying a deadly current is bound to exercise the highest or utmost degree of care and caution to see that no injury comes to persons rightfully in proximity to them even though they be over the land of a third person, the injured parties being free from contributory negligence. And this general rule is applicable to wires of the usual voltage without proper insulation as well as to high tension power lines. McLaughlin v. Louisville Electric Light Co., 100 Ky. 173, 37 S. W. 851, 34 L. R. A. 812; Kentucky-Tennessee Light & Power Co. v. Priest's Adm'r, 277 Ky. 700, 127 S. W. 2d 616. Absent from the present case is the factor of ownership or control by the appellant. It is the failure to have controlled and maintained this deadly wire in proper order upon which liability is sought to be attached, the appellee insisting that such duty rested upon the company.

In Baker's Adm'x v. Kentucky & West Virginia Power Co., 290 Ky. 38, 160 S. W. 2d 360, 362, we reiterated the law to be, and applied it, as stated in 18 Am. Jur., Electricity, section 102, that: "Where the electric wires or other appliances which have caused injury are not owned or controlled by the company furnishing the power, such company is not liable for the damage sustained. The company furnishing the current is not bound to inspect such lines, wires, and appliances to discover defects in insulation or other dangerous conditions; and unless the current is supplied with actual knowledge of such conditions, its responsibility ends when connection is

properly made under proper conditions and it delivers the current in a manner which will protect both life and property.''

Other cases where it was held that the seller of electricity delivered at a switch board connection at the termination of its lines and the beginning of the lines of the property owner was not liable for injuries from defects in the customer's distribution system or lines, are: Kentucky Utilities Co. v. Sutton's Adm'r, 237 Ky. 772, 36 S. W. 2d 380; Smith's Adm'x v. Middlesboro Electric Co., 164 Ky. 46, 174 S. W. 773, Ann. Cas. 1917A, 1164; Maynard v. Kentucky & West Virginia Power Co., 266 Ky. 295, 98 S. W. 2d 460; Ratliff v. Kentucky & West Virginia Power Co., 232 Ky. 262, 22 S. W. 2d 620; Sutton's Adm'r v. Kentucky Utilities Co., 245 Ky. 470, 53 S. W. 2d 711.

The appellees rely upon Thomas's Adm'r v. Maysville Gas Co., 108 Ky. 224, 56 S. W. 153, 21 Ky. Law Rep. 1690, 53 L. R. A. 147, where the court held an electric generating company was liable for the death of a pedestrian on the street caused by the breaking of a wire belonging to a railway company, to which the electric company sold power. As pointed out in the opinion in the Maynard Case, supra, the actual control of the current had remained with the generating company after it entered the street railway system. The current was not merely delivered to a switch board where the control passed to the street railway company exclusively. Of like class is Lewis' Adm'r v. Bowling Green Gaslight Co., 135 Ky. 611, 117 S. W. 278, 22 L. R. A., N. S., 1169.

The Maynard v. Kentucky & West Virginia Power Co. Case, supra, 266 Ky. 295, 98 S. W. 2d 460, is like the present one in that an electric power company had merely sold and delivered current to a mine company's electric system in which there was a defect causing an injury. In this case the receiver of the Coal Company had exclusive control of the premises. The only difference in the methods of sale and delivery of the current to the mining company when it was a going concern and after its property had been taken over by the receiver is that the payments by the residents was through the receiver's agent instead of through the company by deduction from the miner's wages. We find nothing in the record that proves or tends to prove that the distri-

bution system was taken over by the appellant or that it assumed or should have assumed any duty of inspection and maintenance. The situation was like that in other cases cited, especially Smith's Adm'x v. Middlesboro Electric Co., 164 Ky. 46, 174 S. W. 773, Ann. Cas. 1917A, 1164. It is just the same as where there is delivery of electricity at the meter of a private residence. If there is a defect in the wiring inside the house or in some appliance which causes injury, the electric company cannot be held liable in the absence of notice that it was sending its current into such defective wiring or appliance.

It is under this latter rule also that the appellee seeks to come. It is the rule if an electric distributing company has notice that the wiring or fixtures of its customer is defective, such as being uninsulated, and with such notice continues to send its current, it will be responsible for ensuing injury. See Ratliff v. Kentucky & West Virginia Power Co., 232 Ky. 262, 22 S. W. 2d 620; Sutton's Adm'r v. Kentucky Utilities Co., 245 Ky. 470, 53 S. W. 2d 711. It was substantially this condition which made the electric company jointly responsible with a mining company for the death of a boy by a live wire dangling from a pole after a storm, in Kentucky & West Virginia Power Co. v. Riley's Adm'r, 233 Ky. 224, 25 S. W. 2d 366. The electric company had continued to send its current through the wire after it should have known of its dangerous condition.

As we have shown, Coldiron was not the agent of the Kentucky Utilities Company. With him eliminated, there is left only the idea that the reader of the company's meter, located some 500 feet away from the point, must have had notice of the condition. Aside from the question of scope of agency, this would place that employee in the class of other employees who passed along the highway. There was no duty to make an inspection. The defective wire was practically behind the motor barn and was not obvious or even visible from the meter or the highway. There was no evidence whatsoever of any actual or imputed notice upon the part of the appellant.

We are of opinion that the court should have directed a verdict for the defendant in both cases.

The judgments are reversed.