## Teagarden et al. v. Russell's Adm'x.

November 11, 1947.

Rehearing denied January 27, 1948.

James S. Forester, Judge.

Golden & Lay for appellants.

Daniel Boone Smith and Ray O. Shehan for appellee.

OPINION OF THE COURT BY JUDGE CAMMACK—Reversing.

This action was brought by the appellee, Polly Hubbard, against the appellants to recover damages for the alleged wrongful death of her son, Jesse James Russell, age 10. The case is based upon the attractive nuisance doctrine. The appeal is from a $5,000 judgment in favor of the appellee.

The principal ground urged for a reversal is that Mrs. Hubbard failed to show negligence on the part of the appellants, and, therefore, they were entitled to a peremptory instruction. Since we are in accord with this view, we shall confine our consideration of the case to that question.

The appellants were engaged in unloading gravel from a gondola railway car at Baxter, Kentucky. The railway track from which the cars were unloaded paralleled a state highway. The cars were placed over a pit and when the hoppers were opened the gravel fell upon a conveyor belt which was supported by a steel structure and was operated by a gasoline motor. Trucks were driven under the conveyor belt and the gravel was dumped into them. The home of the appellee was almost directly across the road from the place of the unloading operation. Many children passed the place going to and from school. Around 8:30 a. m., April 23, 1946, while the first truck was being unloaded, Robert Feltner, who was operating the machinery, saw a shoe come through the bottom of the railway car. The motor was immediately cut off and the body of Jesse, which was in an upright position, was removed from the gravel. Apparently, he was sucked to the bottom of the car when the hopper was first opened and died of suffocation. School was in progress, but Jesse did not attend on the day he met his death. The reason given by his mother for his non-attendance was that she had awakened late, around 8:00 a. m., and that Jesse did not get up until about 20 minutes later. The school was about

530

10 minutes walking distance away. Mrs. Hubbard said she told Jesse he could go to his grandmother's to plant a garden and she saw him going in that direction. Other witnesses testified that the boy was seen on the highway anywhere from 12 to 45 minutes before the accident. No witness saw him at the place where the gravel was being unloaded at any time on the morning of April 23rd, nor is there any testimony showing that other children were around there when the unloading operation began.

Mr. Feltner said he climbed up the side of the car about 45 minutes to an hour before he started up the motor and that he saw no one in or about the car at that time. He said also that the car was filled to within about two feet of the top. While the exact height of the car is not given, it stands to reason that neither an adult nor a child could tell whether the car was empty or filled without climbing up its side. This would not be true, of course, if the car were heaped at the top, in which event an object upon the top of it would very probably have been visible. Mr. Feltner testified fur- ther that children going to and from school frequently stopped to watch the unloading operation, usually in the afternoon; that he had been instructed to keep children away from the place; and on occasion he had told them to leave. He said he had never seen any children on a car while it was being unloaded, but there was testimony for the appellees showing that children had been seen on cars and around the conveyor belt after working hours. Mrs. Hubbard said she had never seen Jesse around the unloading operation and had never told him to stay away from the place. She was on her porch at the time of the accident, but said the last time she saw Jesse he was going in the direction of his grand-mother's. Walker Blevins, a boy 12 years of age, said he was a friend of Jesse's and that they frequently were about the place where the gravel was being unloaded. He said that sometimes they would get up in the car and ride the gravel down and that Jesse helped Mr. Feltner shovel gravel. When asked, "Was he (Mr. Feltner) in the car with you when you pushed the grav- els down?" he answered, "He was with Jesse; I sat on whatever runs the gravels, wasn't running then." When asked on cross-examination if Jesse ever got in the car

and shoveled gravel when it was running, he answered, "He did sometimes."

It is the position of the appellee that the gravel unloading operation heretofore described constituted an attractive nuisance, and in view of the testimony, especially that of Walker Blevins, it was the duty of Mr. Feltner to ascertain whether or not any children were in or upon the car before he opened the hoppers and started the conveyor belt in motion. On the other hand, the appellants contend that the operation did not constitute an attractive nuisance and that, even if it did, the proof and all of the circumstances pertaining thereto are such that Mr. Feltner owed Jesse no duty other than to avoid injuring him upon the discovery of his peril. It is further contended that liability under the circumstances would have to be based upon the failure of Mr. Feltner to perform some duty he owed Jesse before he began the unloading operation.

Many cases have been before this Court involving the attractive nuisance doctrine. A number of them are discussed and referred to in the recent cases of Louisville & N. R. Co. v. Vaughn, 292 Ky. 120, 166 S. W. 2d 43; Jones v. Louisville & N. R. Co., 297 Ky. 197, 179 S. W. 2d 874, 152 A. L. R. 1259; and Kentucky Utilities Co. v. Hodges' Adm'r, 301 Ky. 252, 191 S. W. 2d 410. The origin, theory and reasons for the doctrine are ably discussed in sections 142 to 147 of 38 Am. Jur., Negligence. It would serve no useful purpose to attempt herein to again analyze our cases dealing with the doctrine, nor do we deem it necessary to attempt to define in general terms what constitutes an attractive nuisance, since each instrumentality or operation constituting an attractive nuisance must be viewed in the light of the facts and conditions relating thereto. By and large, cases involving the doctrine have dealt with situations where the child was injured while playing with, on or about the object, instrumentality, or upon dangerous premises. The appellants take the position that one element of the doctrine is that the child's injury must be brought about by some act on his part, such as setting in motion a turntable or touching an electric wire. In taking this position they place reliance on the case of Smith v. Hines, 212 Ky. 30, 278 S. W. 142, 45 A. L. R. 980, which contains wording to that effect. That case dealt with a

standing railway car and the statement relied upon was not necessary to a decision of the case, nor do we consider it to be in line with the great weight of authority. It is true, as we have indicated, that in the vast majority of the cases involving the doctrine it was an act upon the part of the child and not that of another which brought about his injury, but the doctrine is not limited to such cases. The case at bar is a clear-cut one involving a situation where the injury to the child was brought about by the act of another. The primary question before us is, Did the act of another person, Mr. Feltner, constitute actionable negligence?

We may say at the outset that we do not deem the unloading operation dealt with herein as constituting an attractive nuisance; but, even if we did so view it, we do not think Mrs. Hubbard was entitled to recover.

This Court has frequently held that a railway car of itself is not an attractive nuisance, Smith v. Hines, supra. Certainly, the car in question, which was only filled to within two feet of the top with gravel, did not of itself constitute an attractive nuisance. As we have indicated, neither an adult nor a child standing upon the ground could tell whether the car was partially loaded or empty. It was not until some 45 minutes before Jesse met his death that the car was rolled over the pit. Until that time it was standing upon a siding like any other freight car. There stood only the conveyor belt on its frame and the motor at the unloading place. It was not in operation and there was nothing particularly attractive about it. The actual attraction was the operation of the conveyor belt in carrying the stone from the pit to the trucks. There was little or nothing on the premises for children to play with, though we have noted there was testimony showing that children were seen on the conveyor belt after working hours. Of course when a car was placed over the pit and the unloading operation was begun all three objects, namely, the car, conveyor belt and the truck, were tied into one operation; but it was the conveyance of gravel from the pit to the truck which constituted the primary attraction. When Jesse climbed into the car of gravel, unbeknownst to any one, there was nothing to attract him there any more than to climb into any other car of gravel. Even taking the Blevins boy's testimony at its face value, it

was when gravel was being shoved down toward the hopper that he had seen Jesse in a car, and on those occasions he said Mr. Feltner was with him. It is true that Mr. Feltner said he was looking for children when he climbed up the car some 45 minutes before he began emptying it, but he explained this by saying that he had been told to keep children away from the place. His testimony shows also that had Jesse been standing up in the car his body would have been visible to Mr. Feltner, who was standing on the platform some 8 or 10 feet from the car, as well as to any one standing on the ground a short distance from the car. Certainly he would have been visible to his mother, who was sitting on the porch of her house across the road.

If the contention of the appellee be upheld it was the duty of Mr. Feltner to look in the car before he opened the hopper and started up the conveyor belt. It is conceivable that such a duty might be owing under certain circumstances, but for reasons hereinafter set forth we do not think any such duty was incumbent upon him under the facts of the present case. If we were to so hold, then any person engaged in unloading a car of coal with a device similar to the one which was used in unloading the gravel in this case would be called upon to make an inspection of the inside of the car before the unloading began. In fact it would require virtually the placing of a guard upon the car, because a child could easily climb upon and into the car from the side opposite the unloading operation without the knowledge of the person in charge. Jesse climbed into the car in question without the knowledge of Mr. Feltner or any one else, even though more than one person was in the immediate vicinity just prior to and at the time the unloading began.

We turn now to the second aspect of our conclusion. Jesse did not go to school on the day he met his death. The accident occurred at a time when it was to be expected that he and all other children would be in school. Mr. Feltner had a right to assume they would be there. It is not shown by the record that Jesse or any other child was about the place when the hopper was opened and the belt put in operation. There is some question as to just when the hopper was opened, but we deem this to be beside the point for the reason just stated.

Even if we were to say that Mr. Feltner's duties required him to anticipate that the operation in which he was engaged was such as to attract children, thereby placing upon him the duty of exercising ordinary care to ascertain their presence, no prudent person would be expected to anticipate that children would be playing about the place during school hours.

For the reasons heretofore set forth the judgment is reversed, with directions that it be set aside and for proceedings consistent with this opinion.