Cortez MASON, Administrator of Jarrod C. Walker Estate; Cortez Mason; and Stephanie Walker, Appellants,

v.

CITY OF MT. STERLING, Kentucky; Glenn Potts; Danny Morton; and Debra Morton, Appellees.

No. 2001–SC–0813–DG.

Supreme Court of Kentucky.

Oct. 23, 2003.

Rehearing Denied Jan. 22, 2004.

502

Dana E. Deering, Parry, Deering, Futscher & Sparks, P.S.C., Covington, Steven J. Franzen, Newport, Counsel for Appellants.

Jeffrey C. Mando, Adams, Stepner, Woltermann & Dusing, PLLC, Covington, Counsel for Appellee, City of Mt. Sterling, Kentucky.

Ernest H. Jones, II, Geralds, Moloney & Jones, Robert L. Swisher, Schrader & Rice, P.S.C., Lexington, Counsel for Appellee, Glenn Potts.

Pierce W. Hamblin, Bradley C. Hooks, Landrum & Shouse, LLP, Lexington, Counsel for Appellees, Danny Morton and Debra Morton.

Opinion of the Court by Justice
JOHNSTONE.

Nine-year-old Jarrod Cortez ("J.C.") Walker drowned in Mt. Sterling, Kentucky, when floodwaters swept him away through a submerged/non-visible storm sewer system. Walker's estate filed this wrongful death action against multiple parties, including Appellee City of Mount Sterling (the "City") and private landowners, Appellees Glenn Potts and Danny and Debra Morton. The trial court granted summary judgment to all four Appellees. The Court of Appeals affirmed. We reverse and remand for trial.

The drowning occurred on Potts' property, which is located on the west side of Richmond Avenue near the intersection of Spring Street. Potts' property has two freestanding apartment buildings which share a common parking lot. The Mortons' lot is located across the road from Potts' property on the east side of Richmond Avenue and is bisected by Hinkston Creek.

On May 5, 1996, a rain storm caused substantial flooding on Potts' parking lot, resulting in submerged or "floating" cars. Officer White of the Mt. Sterling Police Department assisted with flood damage control. J.C. and a friend went to Potts' property to see the flood and floating cars. Upon their arrival, Officer White told J.C. that he could stay at the scene if he sat in the bed of a pick-up truck. However, other kids were sliding down a bank into the area of pooled water at the back of the parking lot. At some point, J.C. went to join the other kids. As he walked across the parking lot, J.C. stepped over a submerged culvert entrance (storm drain or headwall) which was covered by opaque muddy water. A strong undertow sucked J.C. down into the storm sewer system. He traveled through Potts' pipes, the City's culvert, and the Mortons' pipes. J.C.'s body was eventually found after midnight in a ball field 200 yards downstream from the system's discharge point into Hinkston Creek. As J.C. went under, a 19-year-old off-duty male soldier swam toward the headwall to rescue J.C. But, the current was too strong. The soldier also was sucked down into the culvert, pulled through the sewer system, knocked

out, and dumped into Hinkston Creek where he was saved by other rescuers.

The storm sewage system was built in three stages: 1) the City built a freestanding fieldstone culvert under Richmond Avenue sometime in the 1930's or 40's; 2) adjacent landowners then built connecting drainage pipes to empty flood waters into the City's culvert; and finally, 3) the City built three catch basins at the Richmond/Spring intersection which connected into the privately built holding chamber on the west side of Richmond (the west chamber).

Potts' privately constructed drainage system begins at the back of his parking lot with an opening (headwall) consisting of two inlet drainage pipes: a 30-inch and a 48-inch pipe. J.C. was sucked through the 48-inch pipe; the 30-inch pipe was impassable as it was clogged throughout with large debris. Potts' pipes run under the parking lot into the west chamber which then connects with the City culvert under Richmond Avenue. Water passes through the culvert to another holding chamber (the east chamber) which connects to a privately built 42-inch pipe on the Mortons' property, which then empties into Hinkston Creek. Both Potts' and the Mortons' pipes were built by previous landowners and were existing artificial conditions acquired when they purchased the land.

The estate introduced expert testimony that: 1) the City's catch basin pipe was badly crushed, impeding the flow of water into the west chamber and exacerbating flooding problems; 2) the east and west chambers were so poorly maintained that the floor of the west chamber had been tom open due to the high force of water; 3) the 30-inch and 48-inch drainage pipes on Potts' property were not properly sized for the clearly foreseeable volume and velocity of storm waters flowing towards these pipes; 4) the asymmetrical size of the two Potts' pipes constitutes improper design which "guarantees" problems in functionality and safety; 5) the City had a duty to monitor the functionality of and properly maintain the storm sewer system; and 6) the flooding at the headwall, the intersection of Spring and Richmond, and/or the flooding in the back yards of houses on Spring Street created a safety hazard that should have alerted the City to serious problems with the sewer system.

## MUNICIPAL LIABILITY FOR PRIVATELY CONSTRUCTED COMPONENTS OF SEWER SYSTEM

 Municipalities in Kentucky are not immune from tort liability, except in the limited circumstances when they are exercising legislative or judicial or quasi-legislative or quasi-judicial functions. *See Gas Service Co., Inc. v. City of London,* Ky., 687 S.W.2d 144 (1985); *Haney v. City of Lexington,* Ky., 386 S.W.2d 738 (1964); *Ashby v. City of Louisville,* Ky.App., 841 S.W.2d 184 (1992). In delineating what constitutes legislative action, this Court has long held that a municipality's decision to establish or open a sewer system is a legislative function entitled to immunity protection. *City of Maysville v. Brooks,* 145 Ky. 526, 140 S.W. 665, 668 (1911). However, once a municipality establishes or opens a sewer, it has a ministerial duty to non-negligently construct, maintain, and repair the sewer system. *Ibid.*

 Further, a municipality has the same duty of care to properly maintain and repair any sewer system where the municipality has "taken possession of and used it [the sewer] for municipal purposes." *Maysville v. Brooks,* 140 S.W. at 667. Thus, even if a municipality did not originally construct a sewer system, if it uses a sewer system for municipal purposes, the municipality's "duty to its inhabitants [is] the same as if the sewer had

been originally constructed" by the municipality. *Ibid.*

J.C. drowned in a sewer system which was cobbled together over the years by various construction efforts of both private and municipal entities. The City argues that since it did not construct the entire sewer system it cannot be liable, especially since J.C. was sucked into the sewer system at the headwall located on Potts' property. The Court of Appeals agreed, holding (with no supporting authority) that "[t]he City's liability cannot extend beyond the portions of the drainage system which lie within its right-of way."

▮▮▮ We disagree and hold that reliance on location or right-of-way alone is not the proper standard for determining municipal liability in situations where sewer systems have both publicly and privately built components. The proper legal standard for determining municipal liability for the maintenance and repair of sewer systems that are partially located on private property or partially built by private parties is whether the municipality, through use or possession, has converted the private discharge system into a public sewer. *Maysville v. Brooks,* 140 S.W. at 667; *see also Town of Central Covington v. Beiser,* 122 Ky. 715, 92 S.W. 973 (1906) and *Price Brothers v. City of Dawson Springs,* 190 Ky. 349, 227 S.W. 470 (1921). The question of duty is a matter of law. *Green v. Hollingsworth,* 35 Ky. 173, 174, 5 Dana 173, 174 (1837). Here, by structurally tying the private system into the public system, the City acquired a duty to properly maintain and repair the sewer system as a whole.

## MUNICIPALITY'S MINISTERIAL DUTY TO MAINTAIN SEWER SYSTEMS

▮▮▮ If a municipality builds a sewer system, which diverts the natural flow of water, the municipality has a duty to ensure that the sewer system can handle runoff from reasonably expected ordinary rainfalls. Ordinary rainfalls "are such heavy rainfalls as may reasonably be expected in the given locality." *Price v. Dawson Springs,* 227 S.W. at 472 (citation omitted). Determination of ordinary rainfall is a jury question: more specifically, it is a fact question for the jury whether, on the day J.C. drowned, the City experienced runoff that might be reasonably expected from ordinary rainfall in the Mt. Sterling area.

The amount of runoff and capacity needs of a sewer system change over time depending on a municipality's population growth and accompanying land development. Thus, even if the City's culvert was sufficient to handle existing water flow in the 1930's and 40's, the City had a "duty to exercise ordinary care and skill to keep it in condition to carry off the water collected thereby from such rainfalls as may be reasonably expected to occur in the neighborhood to be drained by such a sewer." *Louisville v. Norris,* 111 Ky. 903, 64 S.W. 958, 959 (1901) (citations omitted); *see also Town of Wingo v. Rhodes,* 234 Ky. 385, 28 S.W.2d 465, 467 (1930) and *Louisville v. O'Malley,* Ky., 53 S.W. 287 (1899). It is a jury question whether the City met this duty to properly maintain its 1930's sewer system so that it could function safely in the 1990's.

In *Price v. Dawson Springs, supra,* the sewer system in question was located on private property and maintained by private owners, except where it crossed a public street. *Price v. Dawson Springs,* 227 S.W. at 471. When one private landowner sought to alter the sewer configuration on his property, the City of Dawson Springs passed a resolution in support of said change. The *Price* court held that this municipal resolution alone was suffi-

cient to establish municipal control of the sewer and for the City of Dawson Springs to be held liable for any negligent failure to properly maintain the sewer.

In *Town of Central Covington v. Beiser*, *supra*, private landowners constructed a drainpipe across a public alley. Later, the town repaired the alley, but did not alter the drainpipe in any way. The *Covington* court held:

> When it [the town] began to improve the alley it adopted the work which had been done by the interested parties and constructed the alley over the drainpipe, thus adopting and making it [the drainpipe] a part of the city's improvement of the alley. The drainpipe thereby became as much a part of the improvement of the alley, as if the city had placed it there. Thereafter it was the duty of the city to maintain the drainpipe under the alley and to see that it was kept open.

*Covington v. Beiser*, 92 S.W. at 974.

Here, the City built catch basins which drained floodwater into the privately built holding chambers on the west side of the culvert. By tapping into the privately built chambers and making direct use of a private system to handle water from the city catch basins, the City adopted the privately built system as part of the public sewer system and acquired a duty to maintain and repair the same in a non-negligent manner. Whether the City met this duty in a non-negligent manner is a question of fact for the jury.

Finally, the City argues that any flooding caused by the crushed catch basin pipe did not contribute to the floodwaters at the back of Potts' property. However, it is a question of fact for the jury to determine where the flooding water came from: the crushed catch basin, the culvert, or the pipes on Potts' and/or the Mortons' property. *Toebbe v. City of Covington*, 145 Ky. 763, 141 S.W. 421, 422 (1911). Summary judgment was not appropriate against the City.

## ATTRACTIVE NUISANCE

■ Under Kentucky's attractive nuisance doctrine, a possessor of land is liable for any created or maintained artificial condition which the possessor realizes, or should realize, creates an unreasonable risk of bodily harm to children who would not be able to comprehend the risk or danger involved. *Louisville Trust Co. v. Nutting*, Ky., 437 S.W.2d 484, 485 (1968). The Restatement (Second) of Torts, § 339 sets forth the five factors used to determine liability for an attractive nuisance:

> A possessor of land is subject to liability for physical harm to children trespassing thereon caused by an artificial condition upon the land if
>
> (a) the place where the condition exists is one upon which the possessor knows or has reason to know that children are likely to trespass, and
>
> (b) the condition is one of which the possessor knows or has reason to know and which he realizes or should realize will involve an unreasonable risk of death or serious bodily harm to such children, and
>
> (c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling with it or in coming within the area made dangerous by it, and
>
> (d) the utility to the possessor of maintaining the condition and the burden of eliminating the danger are slight as compared with the risk to children involved, and
>
> (e) the possessor fails to exercise reasonable care to eliminate the danger or otherwise to protect the children.

The attractive nuisance doctrine applies only to structures or artificial conditions

on the land. The structure at issue here is the headwall located on Potts' property. An expert testified that the asymmetrical sizes of the Potts' drainage pipes at the headwall (30″ inches versus 48″) constitute improper design creating problems with safety and functionality, *i.e.*, inability to handle foreseeable volume and velocity of storm waters. Under the attractive nuisance doctrine, it is the existence, design, and/or maintenance of the headwall which creates Potts' potential liability in this case. The resulting flooding and pooling of water arose from the artificial condition of the headwall.

Under the Restatement (Second) of Torts, § 339(a), a possessor of land is subject to liability even if he did not know that the artificial condition upon his land was likely to attract the trespass of children or that children would trespass on his land due to the attractiveness of the artificial condition. Comment e, Restatement (Second) of Torts, § 339. Rather, a possessor of land is subject to liability if he "knows or should know that the place is one upon which children are likely to trespass and that the condition is one with which they are likely to meddle." *Ibid.*

Here, children actually lived in the apartments on Potts' property. Children also lived in houses along Spring Street whose backyards abut or face the back of Potts' property near the headwall. Photographs introduced into evidence show swing sets and other children's toys in these adjacent lots. This evidence is sufficient to create a jury question as to whether Potts should have known or have reason to know that children were likely to trespass on his property.

J.C.'s estate must also show that Potts knew or had reason to know that the headwall created an unreasonable risk of death or serious bodily harm to trespassing children. Restatement (Second) of Torts, § 339(b). It is not enough to show that Potts "should know" of trespasses. A possessor of land must have actual notice that children are trespassing or "otherwise receive[ ] information, which would lead a reasonable man to that conclusion." Comment g, Restatement (Second) of Torts, § 339. However, it is an "elementary rule that one is charged with notice of things that are common knowledge and is bound to anticipate the reasonable and natural consequence of his wrongful act, whether of commission or omission." *Louisville & N.R. Co. v. Vaughn*, 292 Ky. 120, 166 S.W.2d 43, 48 (1942).

J.C.'s estate proffered evidence that it was common knowledge that children not only were likely to trespass on Potts' property, but actually lived in apartment houses on Potts' property. "In a closely built-up residential neighborhood children are as much a part of the natural scene as grasshoppers. Their intrusive appearance upon and around the unenclosed premises of such an area is to be expected." *Goben v. Sidney Winer Co.*, Ky., 342 S.W.2d 706, 711 (1960). Whether Potts had notice sufficient to make him subject to liability is a question of fact for the jury.

Potts' defense that he did not build or maintain the headwall is irrelevant under the attractive nuisance doctrine. For a possessor to be held liable for an artificial condition upon the land, the possessor is responsible for the condition even if he did not create it or do anything active to maintain it. Comment d, Restatement (Second) of Torts, § 339. It is enough that the possessor "knows or has reason to know of its existence and realizes or should realize its danger to children." *Ibid.*

Although raised on appeal, the issue of whether J.C. was an invitee or trespasser on Potts' property is irrelevant to liability. Under the attractive nuisance

doctrine whether "children are classified as trespassers, licensees or invitees is not a controlling consideration." *Louisville Trust Co. v. Nutting*, 437 S.W.2d at 485. "The protection afforded trespassing children under section 339 is also extended to children who are licensees and invitees." *Grimes v. Hettinger*, Ky.App., 566 S.W.2d 769, 772 (1978); *see also Louisville and Nashville R.R. Co., v. Hutton*, 220 Ky. 277, 295 S.W. 175, 176 (1927).

Potts argues that the attractive nuisance doctrine does not apply to artificially created ponds and other bodies of water. *See Hanners v. City of Ashland*, Ky., 331 S.W.2d 729 (1959) (city not liable for drowning death in reservoir); *Schauf's Adm'r v. City of Paducah*, 106 Ky. 228, 50 S.W. 42 (1899) (city not liable for drowning of child in pond created in gravel excavation pit). We reject this argument as reductionist.

▮▮▮▮ "Each instrumentality or operation constituting an attractive nuisance must be viewed in the light of the facts and conditions thereto." *Teagarden v. Russell's Adm'x*, 306 Ky. 528, 207 S.W.2d 18, 19 (1947). Applicability of the attractive nuisance doctrine to artificial bodies of water does not turn upon the existence of the water itself, but upon whether the danger associated with the water is open and obvious, even to a child. *Hanners v. City of Ashland*, 331 S.W.2d at 729. Thus, this Court has refused to extend the doctrine of attractive nuisance to the "hazard of drowning while swimming in *confined waters*" (emphasis added) on grounds that:

> such places do not create a condition of unnatural, concealed, or special danger, nor do they involve an unreasonable risk of death or serious bodily harm; 2) the possible hazard of use is generally appreciated even by children of tender years; and 3) the practical impossibility

of adequately guarding such places from the invasion of venturesome boys would impose upon the landowner a duty entirely disproportionate to the risk of injury.

*Id.*, at 730. Here, we do not have a body of "confined water" where the risk is open and obvious. The storm drainage system pulls floodwaters into Hinkston Creek. Eyewitnesses testified that the headwall was completely submerged and invisible when J.C. drowned.

Throughout Kentucky cases, there seems to run the thread of thought, sometimes not clearly expressed, that in order for a structure or condition to constitute an attractive nuisance there must be something in the nature of a hidden or latent danger—a danger that children ordinarily would not recognize or appreciate. *Goben v. Sidney Winer Co.*, 342 S.W.2d at 709. "The character of the danger, as open and obvious, or hidden and latent, is an important consideration." *Ibid.*

▮▮▮▮ Forty years after *Goben*, the "thread of thought" underlying attractive nuisance doctrine as applied to artificial bodies of water remains in need of clear articulation. This Court holds that the attractive nuisance doctrine does not apply to artificially created bodies of contained water (*e.g.*, ponds and reservoirs) if they do not contain a hidden or latent danger or involve an unreasonable risk of death or serious bodily harm. This "rule of non-liability where the danger is open to observation" does not apply where the danger is concealed or involves an unreasonable risk of death or serious bodily harm. *Goben v. Sidney Winer Co.*, 342 S.W.2d at 710. The trial court erred in granting summary judgment as the attractive nuisance doctrine applies in this case where genuine issues of fact exist whether the hidden sewer headwall constituted a concealed

danger and/or involved an unreasonable risk of death or serious bodily harm.

■ J.C.'s estate also argues that the Mortons are liable under the attractive nuisance doctrine by causing water to backup, flooding Potts' property. This Court has held that one may be subject to liability under the attractive nuisance doctrine for "creating or maintaining a dangerous condition on the premises of another." *Goben v. Sidney Winer Co.*, 342 S.W.2d at 711. However, that doctrine does not apply to the Mortons who did not create or maintain the artificial condition *on* the Potts' property. While the Mortons may have contributed to the flooding, the Mortons did not create the artificial condition of the headwall. To the extent *Von Almen's Adm'r v. City of Louisville*, 180 Ky. 441, 202 S.W. 880 (1918), is inconsistent with this opinion, it is hereby overruled.

## LIABILITY OF PRIVATE LANDOWNERS FOR ARTIFICIAL CONDITION

When the Mortons purchased their property, it had a preexisting drainage system or artificial condition. The Court of Appeals correctly held that determination of the Mortons' liability as to the drainage system rests on their acts or omissions in maintaining it. The Court of Appeals concluded that the Mortons were not subject to liability because Danny Morton testified that he had no trouble with the pipe on his property and therefore had no reason to repair it. That is not the proper legal standard for determining liability when a possessor acquires land with existing artificial conditions. The proper standard is set forth in the Restatement (Second) of Torts, § 366:

> One who takes possession of land upon which there is an existing structure or other artificial condition unreasonably dangerous to persons or property out-

side of the land is subject to liability for physical harm caused to them by the condition after, but only after, (a) the possessor knows or should know of the condition, and (b) he knows or should know that it exists without the consent of those affected by it, and (c) he has failed, after a reasonable opportunity, to make It safe or otherwise to protect such persons against it.

Under § 366, a person taking possession of land is required to make reasonable inspection and inquiry as to the condition of the land. Comment c, Restatement (Second) of Torts, § 366. Ignorance of an existing problem is not an excuse. This is especially true where the purchaser has long, continued occupation and use of the land. "A possessor who has used the land for years may reasonably be presumed to know every condition or danger upon it, or to have failed to exercise reasonable care to investigate and discover it." *Ibid.*

The Mortons purchased the property in question in June 1993. J.C. drowned in 1996. However, Danny Morton's history with the property is much more extensive than three years. The property was initially owned by Morton's father and Morton worked on the property for his father. Morton then bought the property from his father, eventually sold it in 1989, and then repurchased it in 1993. Prior to the accident, Danny Morton had resided for 17 years on Richmond Avenue property directly adjacent to his Richmond Avenue business property.

■ Under § 366, the Mortons may "reasonably be presumed to know" of the flooding problem related to the 42-inch drainage pipe. In fact, Danny Morton testified that he witnessed flooding almost every year and recognized the dangers associated with flooding. The Mortons argue that they did nothing to increase the

volume of water. But that is irrelevant to the determination of whether they failed, after reasonable opportunity, to make the drainage system safe. Danny Morton testified that he did absolutely nothing to maintain, alter or fix his drainage system. Under § 366, the trial court erred in holding that the Mortons could not be subject to liability. It is a fact question for the jury to determine whether the Mortons had occupied and used the land for a long enough period of time to create a presumption that the Mortons knew of the dangerous condition or failed to exercise reasonable care to investigate and discover it.

 Finally, the Mortons argue that the flooding water in Potts' parking lot did not originate from their property. But, the Mortons also admitted that flooding occurred regularly on their property. The question of the origin of the water is a classic fact question for the jury. *Maddox v. Peacock Coal Co.*, Ky., 281 S.W.2d 704, 707 (1955). The Mortons had a continuing duty to exercise reasonable care and diligence to maintain their drainage pipe sufficiently to allow free passage of water. *Chesapeake & O.R. Co. v. Saulsberry*, 262 Ky. 31, 88 S.W.2d 949, 951 (1935). As in *Chesapeake*, the Mortons can be subject to liability for failure to maintain an adequate opening for the flow of water. *Id.* at 950.

For the reasons set forth above, this case is reversed as to all Appellees and remanded to the trial court for proceedings consistent with the holdings of this opinion.

LAMBERT, C.J.; STUMBO and WINTERSHEIMER, JJ.,concur.

COOPER, J., concurs with the result only as to POTTS by separate opinion in which he is joined by GRAVES and KELLER, JJ.; concurs with the result only as to MORTON by separate opinion in which he is joined by GRAVES, J.; and dissents with the result as to the City of Mt. Sterling by separate opinion in which he is joined by GRAVES and KELLER, JJ.

GRAVES, J., concurs with the result only as to POTTS and MORTON, and dissents with the result as to the City of Mt. Sterling.

KELLER, J., concurs with the result only as to POTTS, dissents with the result as to the City of Mt. Sterling, and dissents with the result as to MORTON by separate opinion.

COOPER, Justice, concurring in part and dissenting in part.

I agree that Potts should not have been granted summary judgment, but only because there was evidence that the 30–inch pipe across his property was clogged, thus impeding runoff of water from his property and partially causing the flooding of his property. However, I do not agree that the mere existence of this type of drainage system is an attractive nuisance—particularly where, as here, a police officer was present and had warned the child victim not to enter the water. I also agree that Morton was not entitled to summary judgment because there was evidence that the 42–inch pipe constructed across his property was too narrow to accept the discharge from the fieldstone culvert, thus contributing to the flooding of Potts's property. However, I believe the trial judge correctly concluded that the City of Mt. Sterling was entitled to summary judgment.

Contrary to the assertion in the majority opinion, the city did not attach its drainage system to the privately-owned systems

constructed on the Potts and Morton properties. The city only constructed the fieldstone culvert under Richmond Avenue. Appellants' expert, Lester Auble, admitted that this culvert could have accommodated "222 cubic feet of water per second," much more than necessary to drain all of the rainwater that fell on Potts's property on the day J.C. Walker drowned. The city built the culvert in the 1940s. The drainage systems on the Potts and Morton properties were built and attached to the culvert much later. There was *no* evidence that the city was involved in any way in that later construction. Thus, the private systems were attached to the existing city-built system, not vice versa. Although Auble opined that the chambers on either side of the culvert were negligently designed, there was no evidence that any portion of either chamber was designed by the city. Nor was there any evidence other than speculation that either chamber was located within the city-owned right-of-way.

The majority opinion attaches some significance to the fact that the city had built three catch basins a half-block north of the culvert near the corner of Richmond Avenue and Spring Street that were designed to remove water from Spring Street to be drained via an 18-inch pipe from the catch basins to the chamber on the west side of the culvert. However, the evidence is undisputed that, prior to the day of this accident, the 18-inch pipe had been crushed to the extent that any amount of water that may have trickled from Spring Street to the culvert was *de minimus.* Nor does the fact that the city connected the catch basins to the private drainage system convert the latter into a public system or impose liability on the city for its repair. *City of Irvine v. Smith,* 304 Ky. 868, 202 S.W.2d 733, 734 (1947);

*Heitzman v. Sanitation Dist. No. 1,* Ky. App., 26 S.W.3d 794, 796–97 (2000).

Finally, Appellant argues that the city was negligent in failing to construct an adequate drainage system. However, while the city could be held liable for the negligent design and construction of a faulty drainage system, it cannot be held liable for exercising its discretion *not* to expend public funds to construct an adequate drainage system. *Cf. City of Frankfort v. Byrns,* Ky.App., 817 S.W.2d 462, 464 (1991) (decision whether to design and construct a storm water system is a discretionary act, but the subsequent act of designing and building the system was ministerial).

GRAVES, J., joins this opinion concurring in part and dissenting in part. KELLER, J., joins this opinion in part.

KELLER, Justice, concurring in part and dissenting in part.

I agree with Justice Cooper's analysis of Appellee Potts's liability, and I thus concur in the majority opinion to the extent that it vacates the trial court's summary judgment for Appellee Potts and remands that claim to the trial court. I dissent from the remainder of the majority opinion, however, because I would hold that the trial court properly granted summary judgment in favor of the other Appellees—City of Mount Sterling, Kentucky ("the City") and Danny and Debra Morton ("the Mortons")—and I vote to affirm the Court of Appeals's holding, which affirms the summary judgments as to those parties. Because I agree fully with Justice Cooper's analysis of the City's liability, I write separately merely to explain my view that the trial court properly granted summary judgment for the Mortons.

By premising the Mortons' liability upon the alleged inadequacy of the 42″ stormwater drainage pipe located under their property, the majority opinion implicitly suggests that the Mortons were required to accept whatever amount of stormwater that the upstream landowners directed onto the Mortons' property. Kentucky, however, follows a modified version of the civil law rule[1] governing adjoining landowners' rights and duties with respect to surface water: "Although a lower owner is bound to accept *natural drainage* from an upper owner ... the upper owner may not unreasonably change the natural flow of water or cause it to collect and be cast upon the lower estate at a point where it had not previously flowed or in an increased volume or an accelerated rate of flow so as to cause substantial damage to the lower owner."[2] Accordingly, the Mortons had no duty to retrofit the drainage system to accommodate additional drainage if the pipe had become "inadequate" because subsequent improvements had unreasonably increased the volume or rate of stormwater discharge. In this case, the plaintiffs alleged in their complaint (and demonstrated through expert testimony) that "upstream" residential and commercial developments contributed to the flooding conditions by increasing the amount of stormwater runoff. And Kentucky precedent suggests that the Mortons would not be liable for the flooding if the drainage pipe under their property was sufficient to handle the flow when it was installed but subsequently became inadequate because of additional runoff created by other landowners' subsequent developments.[3]

I also disagree with the majority opinion's contention that the facts in this case create a jury question as to the Mortons' liability under Restatement (Second) of Torts § 366. The discovery conducted in this case produced absolutely no evidence to demonstrate—or even to permit a reasonable inference—that the Mortons were aware that the inadequate size and/or condition of the 42″ stormwater drainage pipe located under their property caused flooding at the headwall located on the other side of Richmond Avenue. Although Danny Morton did acknowledge in his deposition that he "witnessed flooding almost every year," it was clearly established through additional questioning at his deposition that he was referring to Hinkston Creek overflowing its banks rather than the stormwater pooling on Potts's parking lot. Any suggestion that the Mortons "should have known" of the problem *traceable to the storm drainage system on their property* is directly refuted by Appellants' own expert's testimony that "the average citizen on the street [does not] understand the dynamics and mechanics of stormwater drainage." By permitting this case to proceed to trial under these facts, the majority effectively holds that summary judgment is never proper as to a *normative* issue of fact—*i.e.,* whether the Mortons "should have known" that the 42″ pipe under their property was inadequate to handle the stormwater discharged into it. In my view, nothing more than pure conjecture—or a desire to find *someone* to blame for this tragic event—would support liability on the part of the Mortons, and the trial court thus correctly granted summary judgment.

1. See 78 AM. JUR. 2D *Waters* § 177 (2002).

2. *Commonwealth, Dept. of Highways v. S & M Land Co., Inc.,* Ky., 503 S.W.2d 495, 497 (1972) (emphasis added). *See also Klutey v.*

*Commonwealth, Dept. of Highways,* Ky., 428 S.W.2d 766 (1968).

3. See *Rutherford v. Louisville & Nashville R. Co.,* Ky., 243 S.W.2d 1017 (1951).

In addition, today's majority misapplies Restatement (Second) of Torts § 366 to the extent that it ignores the commentary as to subparagraph (b), which clarifies that, even in cases where a landowner is actually aware that an artificial condition on his property causes surface water to flood another's property, unless the landowner receives "some notice, complaint, or request to abate the condition"[4] he or she may reasonably assume that the condition exists with the other landowner's consent.[5] And, given that there is no evidence in this case to suggest that the Mortons ever received any such request from anyone, Appellants cannot demonstrate that the condition existed without the consent of the upper landowner. As such, the Mortons cannot be held liable under § 366.[6]

Accordingly, I would reverse the Court of Appeals's opinion to the extent that it affirms the trial court's summary judgment in favor of Appellee Potts, but I would affirm the opinion in all other respects.

---

4. RESTATEMENT (SECOND) OF TORTS § 366 cmt. e (1965).

5. *Id. See also id.* reporters notes (referencing and collecting "an array of more than fifty decisions" holding "that a vendee ... who takes possession of land with an existing private nuisance upon it is liable only after he is given notice of its existence *and requested to abate it.* This is said to be because he is entitled to assume, when he takes possession, that any existing nuisance has the consent of the adjoining landowners." (emphasis added)).

6. RESTATEMENT (SECOND) OF TORTS § 839 ill. 7 (1979). *See also* RESTATEMENT (SECOND) OF TORTS § 366 cmt. a (1965) ("This Section should be read together with § 839, as to liability for a private nuisance[.]")