RENDERED: OCTOBER 24, 2024
TO BE PUBLISHED

# Supreme Court of Kentucky

## 2023-SC-0248-DG

JAIME MORALES          APPELLANT

           ON REVIEW FROM COURT OF APPEALS
V.               NO. 2022-CA-0009
       SCOTT CIRCUIT COURT NO. 19-CI-00593

CITY OF GEORGETOWN, KENTUCKY;          APPELLEES
OFFICER JOSEPH ENRICCO,
INDIVIDUALLY AND IN HIS CAPACITY AS A
DEPUTY WITH THE GEORGETOWN
POLICE DEPARTMENT; GEORGETOWN
POLICE DEPARTMENT; AND LIEUTENANT
JAMES WAGONER, INDIVIDUALLY AND IN
HIS CAPACITY AS A LIEUTENANT WITH
THE GEORGETOWN POLICE
DEPARTMENT

AND

## 2023-SC-0265-DG

LIEUTENANT JAMES WAGONER,          APPELLANT
INDIVIDUALLY AND IN HIS CAPACITY
AS A LIEUTENANT WITH THE
GEORGETOWN POLICE DEPARTMENT

           ON REVIEW FROM COURT OF APPEALS
V.               NO. 2022-CA-0009
       SCOTT CIRCUIT COURT NO. 19-CI-00593

JAIME MORALES; CITY OF GEORGETOWN,          APPELLEES
KENTUCKY; OFFICER JOSEPH ENRICCO,
INDIVIDUALLY AND IN HIS CAPACITY AS
A DEPUTY WITH THE GEORGETOWN
POLICE DEPARTMENT; AND GEORGETOWN
POLICE DEPARTMENT

**OPINION OF THE COURT BY JUSTICE KELLER**

**<u>AFFIRMING IN PART, REVERSING IN PART, AND REMANDING</u>**

Jaime Morales was employed as a Sheriff's Deputy with the Scott County Sheriff's Office ("SCSO") when he was tragically shot in the line of duty, and paralyzed, during a September 2018 law enforcement operation to apprehend an alleged bank robber. Morales thereafter brought a negligence suit against multiple employees of the City of Georgetown ("City") and the Georgetown Police Department ("GPD"). More than six years after Morales sustained his injuries, this Court is now tasked with determining whether the Scott Circuit Court erred in ruling that each of the government defendants was immune from suit. After a thorough review of the record, the applicable law, and the arguments of the parties, we affirm the decision of the Court of Appeals in part, reverse in part, and remand to the Scott Circuit Court for further proceedings consistent with this Opinion.

## I. FACTS AND BACKGROUND

On September 11, 2018, deputies of the United States Marshals Service requested assistance from local law enforcement authorities in apprehending alleged fugitive bank robber, Edward Reynolds. The U.S. Marshals Service had tracked Reynolds to an interstate rest area off I-75 in Scott County where he was purportedly asleep in his car.

At the time of the U.S. Marshals Service's request for assistance, Jaime Morales served as a member of the SCSO and GPD Joint Special Response Team ("SRT"), a joint law enforcement group comprised of members of the SCSO and the GPD who are specially trained in tactical operations. On September 11, 2018, GPD Lieutenant Michael Wagoner ("Lt. Wagoner") was the

2

SRT's Co-Commander and the on-duty supervisor that evening. Upon receiving the U.S. Marshals Service's request for assistance, members of the GPD undertook a threat matrix assessment to determine the appropriate level of law enforcement response. The GPD's threat matrix assessment produced a score of fourteen, which, according to the record, did not necessitate a formal response, or "call-out," from the SRT. Nonetheless, Lt. Wagoner did utilize SRT members, including members of the SCSO, in his response to the U.S. Marshals Service's request for assistance.

Lt. Wagoner specifically testified at deposition that there were several SRT-trained GPD officers on-duty the night of September 11, 2018, and that he planned "to take those officers that were SRT-trained and take the [SRT's armored] truck and go to the rest area and call [Reynolds] out." Lt. Wagoner testified that, prior to engaging with Reynolds, he drove several GPD-affiliated SRT members to a local Cracker Barrel restaurant where they planned to meet with multiple SCSO members of the SRT.

Lt. Wagoner testified that, at the Cracker Barrel, he gathered everyone around the SRT armored truck and explained the plan he had formulated to apprehend Reynolds. According to Lt. Wagoner, he planned to park the SRT's armored truck behind Reynolds's car, blocking him in. The SRT members would then exit the armored truck, line up behind the truck, and order Reynolds to exit his car peacefully. If Reynolds refused to surrender, a trained hostage negotiator would then negotiate with Reynolds.

3

The actual events that transpired the night of September 11, 2018, however, did not unfold according to the purported plan. Once Lt. Wagoner had parked the SRT armored truck behind Reynolds's car, the SRT members did indeed exit the truck. But rather than line up behind the truck, SCSO Deputies Jordan Jacobs and Jaime Morales immediately approached the driver's side of Reynolds's car. GPD Officer Joseph Enricco and SCSO Sergeant Devon Brinegar thereafter followed, so that all four were positioned on the driver's side of Reynolds's car, shoulder to shoulder. When the SRT members yelled for Reynolds to exit his vehicle, Reynolds awoke, started his vehicle, and tried to reverse but was blocked in by the SRT armored truck. Morales then broke the driver's side window of Reynolds's car, and Reynolds subsequently reached for a handgun from his center console. When the SRT members saw that Reynolds was brandishing a gun, they fired their own weapons, killing Reynolds. This entire encounter, from the time the SRT members exited the armored truck to the time that gunfire had ceased, lasted approximately thirty-four seconds.

Amid this chaos, however, Morales was also shot in the spine, rendering him paraplegic. The bullet that injured Morales is still lodged in his spine, and therefore unable to be subjected to ballistics testing. Accordingly, no one knows for certain who fired the shot paralyzing Morales; we do know, however, that Reynolds did not fire any shots from his gun. Morales alleges that it was GPD Officer Enricco, positioned to his right, who inadvertently shot him from behind.

4

According to the circuit court record, Morales understandably enjoyed an outpouring of support from his community after this tragic incident. After Morales was wounded in the line of duty, members of the Georgetown and Scott County community held fundraisers and made t-shirts to raise money for his recovery and care.

In September 2019, nearly a year after the SRT operation to apprehend Edward Reynolds, Morales filed a Complaint in Scott Circuit Court naming both Officer Enricco and Lt. Wagoner as defendants in their official and individual capacities. Morales alleged that both Officer Enricco and Lt. Wagoner were negligent in the fulfillment of their law enforcement duties, thus causing his injuries. Morales's Complaint also asserted negligence and vicarious liability claims against the City of Georgetown and the GPD. More than two years later, in December 2021, the Scott Circuit Court entered an order granting summary judgment to each of the government defendants on immunity grounds. Specifically, the circuit court concluded that both Officer Enricco and Lt. Wagoner were entitled to qualified official immunity from any alleged torts arising from their "discretionary" actions in apprehending Reynolds. Further, the circuit court ruled that the City and the GPD were each immune from Morales's claims of vicarious liability and negligence.

On appeal, the Court of Appeals affirmed the judgment of the circuit court in part, and reversed in part, after concluding that Lt. Wagoner, the City, and the GPD were not immune from *all* of Morales's claims. Specifically, the Court of Appeals held that some of Lt. Wagoner's actions on the day that

5

Morales was shot were "ministerial" actions, undeserving of qualified official immunity. The Court of Appeals also held that the City and the GPD could be held vicariously liable for Lt. Wagoner's alleged negligent performance of these ministerial actions, and that the City and the GPD could each be held directly liable for their own alleged negligence.

This Court thereafter granted the parties' cross-motions for discretionary review.

## II. STANDARD OF REVIEW

"The proper standard of review on appeal when a trial judge has granted a motion for summary judgment is whether the record, when examined in its entirety, shows there is 'no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.'" *Hammons v. Hammons*, 327 S.W.3d 444, 448 (Ky. 2010) (quoting CR 56.03). "Determination that a fact is material or immaterial rests on the substantive law's identification of which facts are critical and which facts are irrelevant." *Kearney v. Univ. of Ky.*, 638 S.W.3d 385, 397 (Ky. 2022) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "An issue of material fact is 'genuine' at the summary judgment phase when discovery has revealed facts which make it possible for the non-moving party to prevail at trial." *Id.* (citing *Welch v. Am. Publ'g Co. of Ky.*, 3 S.W.3d 724, 730 (Ky. 1999)). Summary judgment is not a substitute for trial, and "should not be granted unless 'it appears that it would be impossible for the respondent to produce evidence at the trial warranting a judgment in

6

his favor and against the movant.'" *Id.* (quoting *Paintsville Hosp. Co. v. Rose*, 683 S.W.2d 255, 256 (Ky. 1985)).

"The record must be viewed in a light most favorable to the party opposing the motion for summary judgment and all doubts are to be resolved in his favor." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 480 (Ky. 1991). "It is vital that we not sever litigants from their right of trial, if they do in fact have valid issues to try, just for the sake of efficiency and expediency." *Id.* at 483. "Because summary judgment does not require findings of fact but only an examination of the record to determine whether material issues of fact exist, we generally review the grant of summary judgment without deference to either the trial court's assessment of the record or its legal conclusions." *Hammons*, 327 S.W.3d at 448 (citing *Malone v. Ky. Farm Bureau Mut. Ins. Co.*, 287 S.W.3d 656, 658 (Ky. 2009)).

## III.   ANALYSIS

The doctrines of sovereign and governmental immunity have vexed this Court and the subsidiary courts of the Commonwealth for decades. It is abundantly clear, however, that "pure sovereign immunity, for the state itself, has long been the rule in Kentucky." *Comair, Inc. v. Lexington-Fayette Urb. Cnty. Airport Corp.*, 295 S.W.3d 91, 94 (Ky. 2009). Rather, it is determining the immune status of lesser governmental entities—like counties, municipal corporations, and state agencies—and their agents that has proven to be the more arduous task.

7

"Counties are unincorporated political subdivisions of the state, preexisting its formation, whose existence is provided for constitutionally[.]" *Calvert Invs., Inc. v. Louisville & Jefferson Cnty. Metro. Sewer Dist.*, 805 S.W.2d 133, 138 (Ky. 1991); *see also* KY. CONST. §§ 63–65. A county is "created at the will of the sovereign, without special regard to the consent or will of those residing in it. It is a necessary instrumentality in carrying out the policy of the state and in governing its people. It is governmental in its purpose and nature." *Downing v. Mason Cnty.*, 8 S.W. 264, 265 (Ky. 1888). Accordingly, counties, as political subdivisions of the Commonwealth, enjoy the same sovereign immunity as the Commonwealth itself. *Lexington–Fayette Urb. Cnty. Gov't v. Smolcic,* 142 S.W.3d 128, 132 (Ky. 2004); *see also Yanero v. Davis,* 65 S.W.3d 510, 526 (Ky. 2001). A county "is not, in the strict legal sense, a municipal corporation, like a city." *Downing,* 8 S.W. at 265.

A municipal corporation is:

> A city, town, or other local political entity formed by charter from the state and having the autonomous authority to administer local affairs; [especially] a public corporation created for political purposes and endowed with political powers to be exercised for the public good in the administration of local civil government.

*Municipal Corporation,* BLACK'S LAW DICTIONARY (12th ed. 2024). At common law, municipal corporations, like the City of Georgetown, do *not* enjoy the same sovereign immunity from suit shared by the Commonwealth and its counties. *See Mason v. City of Mt. Sterling,* 122 S.W.3d 500 (Ky. 2003); *Gas Serv. Co., Inc. v. City of London,* 687 S.W.2d 144 (Ky. 1985); *Haney v. City of Lexington,* 386 S.W.2d 738 (Ky. 1964). Rather, this Court has held that Kentucky's cities only

8

enjoy common law immunity from tort liability "in the limited circumstances when they are exercising legislative or judicial or quasi-legislative or quasi-judicial functions." *Mason*, 122 S.W.3d at 504.

Despite this fundamental difference between counties and cities, this Court has treated suits against their respective employees similarly. In the foundational decision on the extent of the immunity afforded to government employees, *Yanero v. Davis*, we stated that:

> When an officer or employee of a governmental agency is sued in his/her **representative** capacity, the officer's or employee's actions are afforded the same immunity, if any, to which the agency, itself, would be entitled . . . . But when sued in their **individual** capacities, public officers and employees enjoy only qualified official immunity, which affords protection from damages liability for good faith judgment calls made in a legally uncertain environment.

65 S.W.3d at 521–22 (emphasis added). A public employee, sued in his individual capacity, is deserving of qualified official immunity from suit for the alleged negligent performance of (1) discretionary acts or functions, (2) undertaken in good faith, and (3) within the scope of the employee's authority. *Id.* at 522.

A discretionary action is one "involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment[.]" *Id.* "Conversely, an officer or employee is afforded no immunity from tort liability for the negligent performance of a ministerial act[.]" *Id.* Ministerial actions are those that require "only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." *Id.* "That a necessity may exist for the

9

ascertainment of those facts does not operate to convert the act into one discretionary in nature." *Id.* (quoting *Upchurch v. Clinton Cnty.*, 330 S.W.2d 428, 430 (Ky. 1959)). Ministerial acts are "direct and mandatory." *Marson v. Thomason,* 438 S.W.3d 292, 297 (Ky. 2014).

The rationale behind exposing a public employee to individual liability for the negligent performance of his ministerial acts is that "a governmental agent can rightfully be expected to adequately perform the governmental function required by the type of job he does. To the extent his job requires certain and specific acts, the governmental function is thwarted when he fails to do or negligently performs the required acts." *Id.* at 296. However, the courts generally immunize public employees in their exercise of discretionary functions because those employees "would be unduly hampered, deterred and intimidated in the discharge of their duties . . . if those who act improperly or even exceed the authority given them were not protected in some reasonable degree by being relieved from private liability." RESTATEMENT (SECOND) OF TORTS § 895D cmt. b (Am. L. Inst. 1979).

When the courts of this Commonwealth are asked to conclude, as a matter of law, whether a government employee's actions are discretionary or ministerial, it is often the government agency's own internal rules, policies, regulations that shed the most light on the distinction. Internal government rules, policies, and regulations necessarily constrain the individual discretion of public employees, and in some instances limit their discretion so greatly as to render their employment functions "absolute, certain, and imperative," and,

therefore, ministerial in nature. *Yanero,* 65 S.W.3d at 522. However, even an unwritten yet generally known rule or policy can impart ministerial obligations on public employees. *See id.* at 529; *Gaither v. Just. & Pub. Safety Cabinet,* 447 S.W.3d 628, 635–36 (Ky. 2014). "[W]e have also recognized that a common law duty—if specific and affirmative in its command—could render an act or function essentially ministerial *in the absence of any statute or regulation on point*[.]" *Haney v. Monsky,* 311 S.W.3d 235, 245 (Ky. 2010).

Thus, examining the pertinent rules, policies, or regulations governing the public employee's challenged conduct may *sometimes* be all that is necessary to make the distinction between ministerial and discretionary. *Meinhart v. Louisville Metro Gov't,* 627 S.W.3d 824, 830 (Ky. 2021). "Compliance with the rule, policy, or regulation simply is not relevant in that calculus. Rather, compliance is relevant to negligence[.]" *Id.* Again, "whether a ministerial act was performed properly, *i.e.,* non-negligently, is a separate question from whether the act is ministerial, and is usually reserved for a jury." *Marson,* 438 S.W.3d at 297.

### A. Morales's Claims Against Officer Enricco and Lt. Wagoner in Their Individual Capacities

Here, Morales alleges that Officer Enricco and Lt. Wagoner breached several ministerial duties during the SRT mission to apprehend the alleged bank robber Edward Reynolds. Accordingly, Morales argues that Officer Enricco and Lt. Wagoner should each be held individually liable for their alleged negligence, and that they are not entitled to qualified official immunity.

11

Morales does not allege that Officer Enricco's or Lt. Wagoner's actions exceeded the scope of their authority or that they were undertaken in bad faith. Therefore, whether Officer Enricco or Lt. Wagoner are entitled to qualified official immunity, as a matter of law, turns on whether their actions and employment functions were ministerial or discretionary. We examine each of Morales's allegations in turn.

### 1. Officer Enricco's act of firing his service weapon was not ministerial.

After adverse treatment of this issue from the circuit court and the Court of Appeals, Morales now attempts to convince this Court that Officer Enricco's act of firing his weapon at Reynolds was ministerial. Specifically, Morales argues that Officer Enricco had a ministerial duty to "ascertain the location of those around him (including but not limited to fellow officers) prior to firing his weapon." This Court, however, is unpersuaded.

In support of his contention, Morales fails to point this Court to any written SRT rules, policies, or regulations that purported to instruct Officer Enricco *when* or *how* to fire his service weapon after he was confronted with an armed suspect. Rather, Morales primarily relies on the testimony of expert witness, retired Chief of the Paris, Kentucky, Police Department, Kevin Sutton ("Chief Sutton") to demonstrate that there was a known rule or standard procedure constraining Officer Enricco's individual discretion in this instance.

Chief Sutton authored an expert report reviewing the SRT's "actions, policies, and training" relevant to the September 11, 2018, incident that injured Morales. Relevant to Morales's negligence claim against Officer Enricco,

12

Chief Sutton opined that, "Once a target is acquired, an officer must determine what or who is behind the target and the surroundings and location of additional persons around prior to discharging a weapon." Chief Sutton further testified during his deposition that, "there comes a point when you are discharging your weapon you also have to be aware of your surroundings."

We are unpersuaded by Morales's attempts to paint an inherently discretionary action—the decision to use deadly force—as one that involves "merely execution of a specific act arising from fixed and designated facts." *Yanero*, 65 S.W.3d at 522. Once he was confronted with an armed suspect, Officer Enricco was forced to make a split-second decision whether or not to fire his own weapon in defense of himself and his fellow officers. Whatever considerations that Officer Enricco was entrusted to make in that fraction of a second—including ascertaining the whereabouts of his fellow officers—were obviously exercises in "personal deliberation, decision, and judgment." *Id.* To hold otherwise, and to subject Officer Enricco's actions in this chaotic moment to dissecting scrutiny, would be to impair the independent discretion of all law enforcement officers charged with protecting the greater public from would-be gunmen. As with many duties entrusted to law enforcement officers, "[i]t is difficult to imagine a situation in which the exercise of significant, independent professional judgment would be more necessary." *Meinhart*, 627 S.W.3d at 834. Officer Enricco's act of firing his weapon at Reynolds, whether it was the correct decision or not, was a discretionary action deserving of qualified official

13

immunity. Summary judgment as to this claim was appropriate as a matter of law.

### 2. Lt. Wagoner had a ministerial obligation to formulate a plan to apprehend Reynolds.

Morales argues that Lt. Wagoner had a ministerial duty to formulate a "tactical" and "operational" plan prior to attempting to apprehend Reynolds, and that Lt. Wagoner is not entitled to qualified official immunity from his claim that he breached that duty.

As support for this contention, Morales references City of Georgetown, Division of Police, General Order No. 047 ("General Order"), a collection of internal policies which purports to regulate the actions of the SCSO and GPD Joint SRT. General Order, Sec. III(A) is entitled "Command/Supervision" and relevantly states that, "The Special Response Commander and Team Leaders will be in charge of the tactical planning and execution of the plan at any and all call-outs." General Order, Sec. III(A)(2). The General Order then goes on to state in a different subsection that, "The SRT will not be deployed without sufficient information as to be able to effectively develop an operational plan." General Order, Sec. III(D)(2). When read in conjunction, the plain language of these policies seemingly indicates that members of the SRT leadership, like Co-Commander Lt. Wagoner, are explicitly charged with developing a plan before SRT team members are dispatched to respond to emergencies. Such a requirement would certainly be logical considering the sensitive, high-risk nature of the SRT's line of work.

14

Regardless, even aside from these policies, there is also testimonial evidence in the record suggesting that SRT supervisors are expected to formulate some plan before they dispatch SRT team members. SCSO Lieutenant Josh Hudnall ("Lt. Hudnall"), the highest-ranking member of the SCSO on the SRT, relevantly testified that regardless of whether a tactical mission is labeled as a formal SRT "call-out," there should be some planning if team members are going to engage in a vehicle assault. Lt. Hudnall testified that there should be a plan in place before any tactical incident, and that sometimes SRT leadership may also make contingency plans. Lt. Hudnall also testified that if Lt. Wagoner was acting as the commander of a tactical or SRT mission, it would be his responsibility to develop the plan. Expert witness Chief Sutton agreed and also testified that it was Lt. Wagoner's responsibility, as the officer in charge of the tactical mission, to decide on and formulate a tactical plan to apprehend Reynolds.

After reviewing the record, this Court is convinced that Lt. Wagoner had an "absolute, certain, and imperative" obligation to formulate some plan to apprehend Reynolds before the SRT team members were dispatched. *Yanero*, 65 S.W.3d at 522. That is not to say, however, that Lt. Wagoner would not later be engaging in discretionary actions, deserving of qualified official immunity, while formulating that plan. Indeed, deciding how to apprehend an alleged fugitive bank robber, and deciding which SRT resources or personnel to utilize in the process, would certainly be exercises in "personal deliberation, decision, and judgment." *Id.*

15

Put more simply, the record indicates that Lt. Wagoner was free to devise how the SRT would attempt to apprehend Reynolds, but he was not free to abstain from creating any plan at all. In this limited sense, his obligation was ministerial, requiring only "execution of a specific act arising from fixed and designated facts." *Id.* Accordingly, to the limited extent that Morales alleges that Lt. Wagoner failed to create a plan and that Lt. Wagoner's alleged nonfeasance caused his injuries, Lt. Wagoner is not entitled to qualified official immunity from that claim. Nonetheless, this Court is still empowered to affirm the circuit court's grant of summary judgment in favor of Lt. Wagoner if Morales has failed to produce "at least some affirmative evidence to show that a material issue of fact exists for a jury to consider." *Kearney*, 638 S.W.3d at 397 (citing *Steelvest*, 807 S.W.2d at 482).

Morales, however, devotes a substantial portion of his brief to highlighting various pieces of evidence in the record that he argues tend to prove that Lt. Wagoner failed to formulate a plan to apprehend Reynolds on September 11, 2018. For instance, SCSO Sgt. Devon Brinegar testified that there was no discussion about a potential vehicle assault when the SRT met at the Cracker Barrel prior to engaging with Reynolds—only discussion about ordering Reynolds out of his vehicle. According to Sgt. Brinegar, there was no plan in place if Reynolds refused to comply with the SRT's orders. SCSO Deputy Jordan Jacobs testified that he did not recall whether there was any discussion at the Cracker Barrel about a plan to apprehend Reynolds. Deputy Jacobs did, however, testify that there was some discussion of a plan involving

16

a vehicle assault while the SRT traveled to the I-75 rest area in the SRT armored truck. Officer Enricco testified that there was "not necessarily" a plan for what the SRT members would do after they made contact with the back of Reynolds's car.

Again, whether Lt. Wagoner, in fact, breached any ministerial duty to formulate a plan, and was therefore negligent, is not relevant to the question of qualified official immunity and is, rather, a question left to the finder of fact. *Meinhart*, 627 S.W.3d at 830. The above-cited evidence, when viewed in a light most favorable to Morales, is sufficient to create a genuine issue of material fact regarding Lt. Wagoner's alleged negligence. That is not to say, however, that Morales will prevail on remand, or even that he has a high likelihood of prevailing in his claim against Lt. Wagoner. Rather, our review on appeal is limited to whether it would be impossible for Morales to produce evidence at trial warranting a judgment in his favor. *Kearney*, 638 S.W.3d at 397. "It is vital that we not sever litigants from their right of trial, if they do in fact have valid issues to try, just for the sake of efficiency and expediency." *Steelvest*, 807 S.W.2d at 483. Summary judgment was inappropriate as to this claim at this time.

### 3. Lt. Wagoner's actions in supervising his subordinates were discretionary.

Morales next argues that Lt. Wagoner's act of supervising his subordinates was a ministerial function undeserving of qualified official immunity. Specifically, Morales attempts to make a material distinction between Lt. Wagoner's "obligation" to supervise his subordinates and the

17

"manner" in which he supervised them. This Court, however, is unpersuaded by Morales's attempt to split hairs and reframe this issue. Deciding when, how, or to what degree one will supervise his subordinates is an inherently discretionary function deserving of qualified official immunity.

The General Order states that, "[SRT] supervision will consist of a Commander and two Team Leaders designated by the Chief of Police." General Order, Sec. III(A)(1). The General Order also provides that the "commander and team leaders will be responsible for unit training, coordination of assigned team members, and informing the Chief of Police of team activities and status." *Id.* The General Order further states that, "No other team member shall supervise, direct, or attempt to control any element of the SRT unless authorized by one of the following: Commander, Chief of Police or his designee." General Order, Sec. III(A)(3). When read in conjunction, these provisions would seem to place the sole authority to supervise the SRT squarely on Lt. Wagoner and the other members of the SRT leadership.

The General Order, however, lacks any meaningful policies that significantly constrained Lt. Wagoner's discretion in deciding *how*, *when*, or *to what extent* he would supervise the SRT during its mission to apprehend an alleged fugitive bank robber. The absence of any such policies is significant, and is likely a reflection on the notion that "supervising the conduct of others is a duty often left to a large degree—and necessarily so—to the independent discretion and judgment of the individual supervisor." *Haney v. Monsky*, 311 S.W.3d 235, 244 (Ky. 2010).

18

In *Haney*, a summer camp counselor at the Louisville Zoo was alleged to have negligently supervised the children in her care during a nighttime hiking activity. *Id.* at 239. Despite receiving an instruction to "keep the children in the middle of the path," one of the children under Haney's supervision was injured when he fell from the hiking path. *Id.* at 243. In concluding that Haney's supervisory actions were discretionary, and thus deserving of qualified official immunity, this Court stated that Haney was merely under a "general and continuing supervisory duty . . . which depended upon constantly changing circumstances[.]" *Id.* We further stated that the limited instructions that Haney received to supervise the children were "subjective and 'left to the will or judgment of the performer[.]'" *Id.* (quoting *Upchurch*, 330 S.W.2d at 430).

Here, Lt. Wagoner was charged with supervising a dangerous law enforcement mission—one so sensitive that he chose to utilize the specially trained members of the SRT in his response. Accordingly, the manner in which Lt. Wagoner was to lead this mission was not certain, fixed, or prescribed for him; he had to rely on his own judgment, experience, and discretion to accomplish the objective of the mission. Further, from the moment that the SRT arrived at the I-75 rest area, Lt. Wagoner and his team were forced to react and adapt to changing circumstances. Lt. Wagoner's actions in this instance were discretionary and deserving of qualified official immunity. Accordingly, summary judgment was appropriate as to this claim.

19

### 4. Lt. Wagoner did not have a ministerial obligation to ensure that his subordinates wore their SRT-issued tactical vests.

Morales next alleges that Lt. Wagoner had a ministerial duty to ensure that the SRT team members were each wearing their tactical safety vests during the mission to apprehend Reynolds.

The General Order relevantly states that, "SRT members will be issued tactical clothing and personal use equipment. The team member will keep this equipment with him/her and always carry them while on duty. When off duty, the team member will keep the equipment at home and accessible in case of call out." General Order, Sec. III(E)(1). The General Order then goes on to state that, "Each team member will be responsible for the maintenance and up keep of their equipment and clothing. In the event that a team member resigns from—or is removed from—the team, the team member will immediately return all issued clothing and equipment." General Order, Sec. III(E)(2).

These two provisions, however, are the extent of the General Order's explicit mandates concerning SRT equipment and clothing. And when read in their entirety, it is evident that these policies lack any directive requiring SRT members to wear tactical vests during SRT missions. Further, the above policies appear only to impose affirmative obligations on individual SRT team members—not on the SRT Commander.

In the absence of a concrete, written rule on the matter, Morales argues that there was an unwritten yet generally known rule requiring that tactical vests be worn during all SRT missions, and that Lt. Wagoner was duty-bound

20

to enforce such a rule. After a thorough review of the record, this Court is unpersuaded.

Lt. Wagoner relevantly testified that he believed SRT members "knew that they were expected to wear their given equipment," because "it was probably said at some point." Lt. Wagoner also testified that he "[did not] know who would have told them that it was expected, but it was expected." However, Lt. Wagoner then testified that he believed he did not have the authority to direct Morales to put on a tactical vest during the mission to apprehend Reynolds.

SCSO Lt. Josh Hudnall testified that if SRT members are responding to an SRT call-out they should wear their tactical gear, but if their operation is not an SRT call-out then it would be their decision as to what to wear and what not to wear.

At his own deposition, Morales relevantly testified that he kept his own tactical vest in the trunk of his SCSO cruiser. Upon arriving at the Cracker Barrel on September 11, 2018, and before departing for the I-75 rest area, Morales observed some of his fellow SRT members wearing tactical vests while others were not. Morales specifically noted that his SCSO supervisor, Sgt. Brinegar, was not wearing a tactical vest. According to Morales, he asked Sgt. Brinegar, "if we should wear our vests or why he wasn't wearing his vest, something along those lines." Morales does not remember what Sgt. Brinegar told him in response to this question, but Morales testified that he interpreted Sgt. Brinegar's response to mean that he did not need to wear his tactical vest. Morales also testified that he asked SCSO Sgt. Jeremy Nettles if he should

21

"plate up" while they were in the SRT armored truck, and that Sgt. Nettles "acted like it was my decision." Morales testified that it was "not always" customary for him to wear his tactical vest during SRT call-outs.

Officer Enricco testified that he wore his tactical vest during the mission to apprehend Reynolds, and that he had previously been instructed to wear his tactical vest during any SRT call-out. Officer Enricco testified that the SRT's "general orders" provided this instruction.

SCSO Deputy Jordan Jacobs, a member of the SRT, testified that he decided to wear his tactical vest during the mission to apprehend Reynolds. Deputy Jacobs testified that no one ever told him whether or not he should wear his tactical vest during SRT missions, and that he believed such a decision was left to the discretion of the individual officer.

Upon a review of the record, we cannot conclude that Lt. Wagoner's duties and job functions in this instance were ministerial. Regardless of whether SRT team members were obligated, instructed, or directed to wear their tactical vests on September 11, 2018, there seems to be no indication that Lt. Wagoner himself was under an "absolute, certain, and imperative" directive to individually ensure that the SRT team members indeed wore their tactical vests. *Yanero,* 65 S.W.3d at 522. The General Order certainly does not impose a requirement on Lt. Wagoner to individually ensure that each SRT member is wearing their tactical vest during SRT missions, and there seems to be no evidence in the record tending to prove the existence of such an unwritten affirmative duty. Rather, Lt. Wagoner conversely testified that he believed he

22

did not have the authority to direct Morales to wear a tactical vest during the mission to apprehend Reynolds. Of course, the General Order entrusted Lt. Wagoner, as Co-Commander of the SRT, with general supervisory authority over the SRT's team members, but the record does not reflect that Lt. Wagoner's supervisory discretion was constrained, and his actions circumscribed and predetermined, in this respect.

Morales argues that his claim against Lt. Wagoner is similar to the plaintiff's claim against two baseball coaches in *Yanero*. There, a junior varsity baseball player, Yanero, was injured after he was struck by an errant pitch during batting practice. *Id.* at 517. Despite the existence of an unwritten yet known rule requiring that players wear a helmet during batting practice, Yanero was not wearing a helmet at the time he was injured. *Id.* at 529. This Court concluded that the two coaches charged with supervising Yanero were not entitled to qualified official immunity from the plaintiff's negligence claims because they each had a ministerial duty to enforce the known rule regarding batting helmets. *Id.* However, the coaches' actions in that instance were not ministerial simply because such a rule existed, but rather because this Court determined the coaches had a common law duty to "exercise that degree of care that ordinarily prudent teachers or coaches engaged in the supervision of students of like age as the plaintiff would exercise under similar circumstances." *Id.* More simply, the coaches had a ministerial duty to ensure that the minors they were supervising complied with the relevant rules regarding batting helmets. *Id.*

23

Here, Morales has failed to point this Court to any policies, rules, or regulations, written or unwritten, that indicate that it was Lt. Wagoner's duty to ensure that SRT team members wore their tactical vests during the mission to apprehend Reynolds. Rather, the only evidence in the record that purports to contravene Lt. Wagoner's own testimony on the matter is that of expert witness Chief Sutton. Chief Sutton relevantly testified that, in his expert opinion, Lt. Wagoner should have "absolutely" made sure that all SRT members wore their tactical vests during the mission to apprehend Reynolds. Chief Sutton also testified that, "somewhere in [the] policy that should be written that absolutely anytime there's a tactical situation if you have that plated armor that's available, it must be worn." However, in this Court's review of the record, Chief Sutton's expert opinion on what actions Lt. Wagoner *should* have taken or what policies *should* be written and enforced has little bearing on what actions Lt. Wagoner was actually bound or required to take on September 11, 2018. In determining whether a public employee's actions are ministerial or discretionary, the greatest benchmarks are the internal policies governing the employee's conduct and any evidence regarding the discretionary considerations the employee typically makes in performing that expected function. To this Court, Lt. Wagoner's actions in the present instance were discretionary, not ministerial. Accordingly, summary judgment was appropriate as to this claim.

## 5. Lt. Wagoner did have a ministerial obligation to enforce certain mandatory training requirements.

Morales next alleges that Lt. Wagoner breached a ministerial duty to enforce certain training attendance requirements imposed by the General Order.

The General Order relevantly states that, "The [SRT] commander and team leaders will be responsible for unit training[.]" General Order, Sec. III(A)(1). The General Order further imposes certain training attendance requirements on individual members of the SRT and SRT leadership:

  a. Team members must have 100% participation in all monthly training unless absence is approved by the Team Commander, *or* Team Leaders.

     . . .

  e. Any team member who missed training or any testing must have approval by the commander or a team leader. If a team member misses testing due to an illness or injury, that individual will be retested when he/she is released back to work.

  f. Any team member, who has three unexcused absences from call outs within a six-month period will be removed from the team.

  g. Each team member will be required to attend all team training exercises as scheduled. If a team member has three unexcused absences from training within a six-month period, the team member will be removed from the team.

General Order, Sec. III(C)(2)(a), (e)–(g).

Upon our review of these relevant policies, it seems clear that the only ministerial obligation these policies impose on Lt. Wagoner, as Co-Commander of the SRT, is to remove team members from the SRT if they have accumulated

25

three unexcused absences from call-outs or training. General Order, Sec. III(C)(2)(f)–(g). In these two instances, Lt. Wagoner's duties are "absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." *Yanero*, 65 S.W.3d at 522. If a team member has three unexcused absences from either training or call-outs in a six-month period, then Lt. Wagoner is bound to remove them from the SRT. In this respect, the General Order's instructions are clear, mandatory, and direct, leaving no room for Lt. Wagoner to exercise any discretion in fulfilling his duty. Accordingly, to the limited extent that Morales alleges that Lt. Wagoner failed to remove SRT team members who accumulated three unexcused absences from SRT training sessions or call-outs, and that Lt. Wagoner's alleged nonfeasance caused his injuries, Lt. Wagoner cannot claim qualified official immunity from such a claim.

However, this Court is empowered to affirm the circuit court's grant of summary judgment in favor of Lt. Wagoner if Morales has failed to produce any evidence in the record that creates a genuine issue of material fact regarding Lt. Wagoner's alleged nonfeasance. *Kearney*, 638 S.W.3d at 397 (citing *Steelvest*, 807 S.W.2d at 482). Logically, if there is no evidence tending to support Morales's negligence theory, it is immaterial that Lt. Wagoner is not entitled to qualified official immunity. But that is not the case here.

There is at least some evidence in the record supporting the theory that the SRT leadership failed to enforce the General Order's training attendance requirements. Morales himself testified that all SRT members were required to

26

attend training once a month, but that the SRT's training attendance requirements were not enforced. SCSO Deputy Jordan Jacobs testified that SRT members were only encouraged to go to trainings, that training attendance was not actually required, and that there was no penalty if SRT members missed the SRT trainings. Sgt. Nettles testified that the SRT held monthly training sessions, but there was no penalty if SRT members failed to attend.

There is also evidence in the record tending to support the theory that members of the SRT did not attend every SRT training exercise. Lt. Hudnall testified that there were times when SRT members would have to miss trainings, resulting in both excused and unexcused absences. Officer Enricco testified that there was at least one SRT training session that he did not attend, and that he could not remember or recall other specific SRT training exercises. Deputy Jacobs testified that he personally did not attend two SRT trainings. Sgt. Nettles also testified that he attended all of the SRT trainings that he could, but that he did not attend every training.

The above evidence, when viewed in a light most favorable to Morales, creates a genuine issue of material fact regarding Lt. Wagoner's alleged failure to remove SRT members who accumulated three unexcused absences from mandatory SRT training exercises. Summary judgment as to this specific claim was therefore inappropriate at this juncture.

27

## B. Claims of "Vicarious Liability" and "Direct Liability" Against the City and GPD

Morales next argues that the City and the GPD should each be held "vicariously liable" for the alleged negligence of their employees, Officer Enricco and Lt. Wagoner.

As previously stated, since the mid-twentieth century, the general rule in this Commonwealth has been that cities and municipalities only enjoy common law immunity from tort liability "in the limited circumstances when they are exercising legislative or judicial or quasi-legislative or quasi-judicial functions." *Mason*, 122 S.W.3d at 504. After this Court reaffirmed its abrogation of the existing doctrine of municipal immunity in favor of broader municipal liability, *see Gas Serv. Co.*, 687 S.W.2d at 150, the General Assembly swiftly elected to codify that principle in the Claims Against Local Governments Act (CALGA). *See* KRS 65.200–2006. This enactment was evidently part of a larger movement among state legislatures attempting to regulate the liability of local government entities. *See* 5 AMERICAN LAW OF TORTS § 17:23. In enacting CALGA, the General Assembly importantly disclaimed any intent to modify the then-existing immune status of any local government. *Schwindel v. Meade Cnty.*, 113 S.W.3d 159, 164–65 (Ky. 2003) (citing KRS 65.2001(2)).

KRS 65.2003(3) relevantly mirrors this Court's holdings on municipal liability and states that, "[A] local government shall not be liable for injuries or losses resulting from . . . [a]ny claim arising from the exercise of judicial, quasi-judicial, legislative or quasi-legislative authority or others, exercise of judgment

28

or discretion vested in the local government[.]" In interpreting KRS 65.2003(3), this Court has previously stated that the subsection "obviously pertains to 'claims disallowed' against municipalities[.]" *Schwindel,* 113 S.W.3d at 166. Aside from broadly defining the types of municipal functions deserving of immunity, KRS 65.2003(3) conveniently includes a non-exhaustive list of examples:

> (a) The adoption or failure to adopt any ordinance, resolution, order, regulation, or rule;
>
> (b) The failure to enforce any law;
>
> (c) The issuance, denial, suspension, revocation of, or failure or refusal to issue, deny, suspend or revoke any permit, license, certificate, approval, order or similar authorization;
>
> (d) The exercise of discretion when in the face of competing demands, the local government determines whether and how to utilize or apply existing resources; or
>
> (e) Failure to make an inspection.

KRS 65.2003(3)(a)–(e).

While the statute's non-exhaustive list of immune actions is indeed instructive in determining the boundaries of municipal liability, perhaps even more illuminating is the statute's explicit caveat that, "Nothing contained in this subsection shall be construed to exempt a local government from liability for negligence arising out of acts or omissions of its employees in carrying out their ministerial duties." KRS 65.2003(3). This provision makes clear that, to the extent a municipal employee is performing a ministerial function, the municipality is not immune from claims arising from the employee's alleged

29

negligence. Accordingly, to the extent that we have held Lt. Wagoner was engaging in ministerial functions, and to the extent that Morales alleges Lt. Wagoner's negligent performance of those ministerial actions caused his injuries, the City can be held liable for its employee's alleged negligence. The City is not immune from these claims.

Morales finally argues that the City and the GPD are not immune from his claims of "direct" negligence. Upon our review of the record, it appears that Morales generally alleges that the City and the GPD each (1) negligently failed to train their employees in accordance with the General Order's training requirements and that (2) they negligently failed to select qualified and adequately trained individuals to participate in the September 11, 2018, mission to apprehend Reynolds. Morales's Complaint specifically alleges that

> [t]he GPD breached his [sic] duties as on the Reynolds call-out by failing . . . to have [SRT team members] properly trained, by permitting inadequately trained GPD SRT members to serve on the call-out . . . and by failing to ensure that policies and procedures were known and enforced.

"Despite the general recognition that governmental bodies can act only through their officers, agents, or employees, courts may distinguish the tortious acts or omissions of the officers, agents, or employees from acts or omissions that, independent of the doctrine of respondeat superior, may be attributed *directly* to the governmental entity." 57 AM. JUR. 2D *Municipal, etc., Tort Liability* § 147 (emphasis added). In these instances, a municipality may be directly liable when the alleged negligent act is "done by the authority and order of the municipal government or its branches." *Id.* Whether the City and

30

the GPD are immune from Morales's direct negligence claims again turns on whether his claims arise from their "exercise of judicial, quasi-judicial, legislative or quasi-legislative authority or others, exercise of judgment or discretion vested in the local government[.]" KRS 65.2003(3).

Here, it suffices to state that the City's alleged actions or inactions in this instance—failing to enforce SRT training requirements and failing to select qualified employees to respond to an emergency—are exercises in judgment or discretion vested in the local government, and therefore deserving of immunity. First, as referenced above, CALGA specifically immunizes municipalities from liability arising from their adoption of "any ordinance, resolution, order, regulation, or rule" and likewise from their alleged failure to enforce any of the laws they have adopted. KRS 65.3002(3)(a)–(b). Second, CALGA immunizes municipalities from liability arising from their "exercise of discretion when in the face of competing demands, the local government determines whether and how to utilize or apply existing resources[.]" KRS 65.2003(3)(d). We interpret these statutory provisions as broad enough to preclude Morales's claims that the City and GPD negligently failed to train the SRT in accordance with their delineated training requirements and further, failed to select qualified employees to attempt to apprehend Reynolds.

In the present case, the training of SRT members, the enforcement of the SRT training requirements, and the ultimate selection of the SRT members who were called upon to apprehend Reynolds were each exercises in discretion made during the City's and the GPD's consideration of how to best manage and

31

operate the SRT within its finite personnel and resources. These considerations are inherently discretionary in nature, and therefore cannot be a basis for liability in this instance because "it is not a tort for government to govern." *Bolden v. City of Covington*, 803 S.W.2d 577, 580 (Ky. 1991) (quoting RESTATEMENT (SECOND) OF TORTS § 895D cmt. e (Am. L. Inst. 1979)). Accordingly, summary judgment was appropriate as to these claims.

## IV.    CONCLUSION

For the foregoing reasons, we affirm the judgment of the Court of Appeals in part, reverse in part, and remand to the Scott Circuit Court for further proceedings consistent with this Opinion.

All sitting. VanMeter, C.J.; Conley, Lambert and Nickell, JJ. concur. Thompson, J., concurs in result only. Bisig, J., concurs in part and dissents in part by separate opinion.

BISIG, J., CONCURRING IN PART AND DISSENTING IN PART. I concur with much of the well-written Majority Opinion.  However, I disagree that the evidence of record provides any basis on which a jury could find a violation of either the duty to plan or the duty to train.  As such, I would affirm the trial court's grant of summary judgment in full.

As to Morales' claim for violation of the duty to plan, I agree that the policies and testimony at issue establish Lt. Wagoner had a ministerial duty to formulate a tactical and operational plan before a call-out.  However, I disagree the evidence could support a jury finding that this duty was violated.  As Morales himself testified, Lt. Wagoner at a minimum assembled the team,

32

instructed them that the plan was to block in the suspect Reynold's vehicle, and further directed they would proceed in two teams. Even construed in the light most favorable to Morales, I would find this testimony sufficient to establish that Lt. Wagoner complied with his ministerial duty to formulate a tactical and operational plan before the mission. It is beyond the province of the judiciary, a judge, or a jury to determine after the fact whether Lt. Wagoner's plan was a "good" one or a "bad" one. Moreover, subjecting officers to potential liability on the basis of such post hoc determinations—made in the calm of a court room with the benefit of hindsight unavailable to officers on the street in the heat of a call-out—significantly interferes with the discretion needed for law enforcement to include flexibility in their planning of missions and to adapt under the rapidly changing circumstances of each call-out. As such, I would affirm the trial court's summary judgment as to the claim for violation of the duty to plan.

As to the training claim, I agree the relevant policies imposed a ministerial duty to remove from the team anyone with three unexcused absences from trainings or call-outs. However, I disagree that the trial court erred in granting summary judgment against Morales on that claim. While Morales presented the trial court with evidence regarding a general laxness in training attendance, documentation, and enforcement, the record reveals no actual evidence that any member of the SRT was allowed to remain on the team after having three unexcused absences. In other words, the record is also devoid of any evidence of an actual violation of the training policies. As such, I

33

would also find the trial court correctly granted summary judgment against

Morales on the training claim, and therefore would affirm the trial court in full.


COUNSEL FOR APPELLANT/CROSS-APPELLEE, JAIME MORALES:

Elliott Clay Miller
Thomas Walcutt Miller
Elizabeth Catesby Woodford
Miller, Griffin & Marks, P.S.C

COUNSEL FOR APPELLEE/CROSS-APPELLANT, LIEUTENANT JAMES
WAGONER, INDIVIDUALLY AND IN HIS CAPACITY AS A LIEUTENANT WITH
THE GEORGETOWN POLICE DEPARTMENT:

Jason B. Bell
Bell, Hess & Van Zant, PLC

COUNSEL FOR APPELLEES, CITY OF GEORGETOWN AND
GEORGETOWN POLICE DEPARTMENT:

Maureen Camilla Malles
Lyndol Scott Miller
Sturgill Turner Barker & Moloney, PLLC

Devon Elise Golden
City Attorney, City of Georgetown

COUNSEL FOR APPELLEE, OFFICER JOSEPH ENRICCO, INDIVIDUALLY AND
IN HIS CAPACITY AS A DEPUTY WITH THE GEORGETOWN POLICE
DEPARTMENT:

Jeffrey Charles Mando
Adams Law, PLLC